UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

Joshua S. Farner,

    *Plaintiff,*

v.

Kristin Conlon *et al.*,

    *Defendants.*

No. 23 CV 1767

Judge Lindsay C. Jenkins

MEMORANDUM OPINION AND ORDER

Plaintiff Joshua Farner, a former inmate at the Metropolitan Correctional Center in Chicago, brings this *Bivens* action against MCC employees alleging that his Eighth Amendment rights were violated through deliberate indifference to his medical needs including psychiatric conditions and a stomach abscess, and failure to intervene in multiple suicide attempts. Before the court is Defendants' motion to dismiss the second amended complaint for failure to state a claim, [Dkt. 78]. Fed. R. Civ. P. 12(b)(6). For the reasons below, the motion is granted.

## I.    Background

At the motion to dismiss stage, the court accepts as true all well-pleaded allegations set forth in the operative complaint, [Dkt. 74], and draws all reasonable inferences in Plaintiff's favor. *See Craftwood II, Inc. v. Generac Power Sys., Inc.*, 920 F.3d 479, 481 (7th Cir. 2019).

On or around June 2021, Plaintiff Joshua Farner was transferred from Dixon Correctional Center to MCC Chicago ("MCC"). At the time of transfer, he had been housed in the Dixon Correctional Center's Mental Health Unit in its highest security

1

classification. He had also been diagnosed with bipolar disorder, borderline personality disorder, anti-social personality disorder, and post-traumatic stress disorder ("PTSD"). Since 2016 or 2017, Farner had been on a forced medication regimen prescribed by an Illinois Department of Corrections ("IDOC") treatment review committee of psychiatrists and forensic psychologists, which included antipsychotic drugs. A "forced medication" regimen refers to prescribed medications that inmates are not allowed to refuse. [Dkt. 74, ¶¶ 18–20.]

Upon transfer to MCC, Farner completed a clinical intake with a Correctional Counselor. He relayed his general medical history to the counselor and told the counselor that he was contemplating suicide. The counselor informed MCC psychologists of Farner's condition and Farner was accordingly housed on MCC's "Care Level 3" where inmates are required to have weekly visits from a Bureau of Prisons ("BOP") psychologist and additional sessions on request, a monthly session with a psychiatrist, and a cellmate. He was also placed on suicide watch for one night.[1] Farner alleges that his diagnoses and forced medication regimen were reflected in his medical records, which Defendants and other MCC employees were able to review. [*Id.* at ¶¶ 21–24, 31.]

Despite MCC's awareness of his psychiatric conditions and forced medication regimen, Farner alleges that MCC's care fell short. MCC medical staff under the supervision of Dr. Brij Mohan didn't require Farner to take his forced medication regimen. MCC also failed to refer him to a psychiatrist, even though Farner

---

[1]     Suicide watch cells are set up at MCC such that correctional officers can constantly monitor an inmate in the cell through transparent glass walls. [Dkt. 74, ¶ 51.]

repeatedly requested one throughout his incarceration, including from Dr. Mohan, Dr. Bonnie Nowakowski, and MCC psychologists Kristin Conlon, Jason Dana, and Dave Szyhowski. Farner also alleges that the facilities he was housed at prior to MCC prescribed different medications that managed his conditions more effectively. [*Id.* at ¶¶ 12–16, 25–30.]

After two weeks in quarantine on Care Level 3, MCC moved Farner to a general population unit where his mental state began to deteriorate. [*Id.* at ¶ 32.] Prior to July 14, 2021, Conlon and Dana managed Farner's weekly psychology sessions, although Farner usually met with Conlon. [*Id.* at ¶ 25.] On July 14, 2021, Farner discussed his suicidal ideation with Conlon and relayed his intent to commit suicide by swallowing razor blades. Despite this revelation, Conlon returned Farner to general population and didn't place him on suicide watch. Inmates in general population have access to free razors provided by MCC, while those on suicide watch do not. [*Id.* at ¶¶ 33–36.]

Farner followed through with his plan by swallowing MCC-provided razor blades and a bed-frame hook later that night. Regretting his decision, Farner alerted correctional officers about his suicide attempt and was sent to Thorek Memorial Hospital ("Thorek") for treatment. Farner initially refused surgery to remove the hooks and razor blades and remained at the hospital on pain medication, supervised by deputy marshals. While at the hospital, Farner made another failed suicide attempt by swallowing shower hooks and using his tie-up gown (which BOP policy prohibited him from having due to his recent suicide attempt) to hang himself. After

this attempt, Farner agreed to undergo surgery. Thorek prescribed Farner pain medication and released him back to MCC. [*Id.* at ¶¶ 37–43.]

Upon his return, Farner was placed on suicide watch. MCC's medical staff, supervised by Dr. Mohan, failed to give Farner the medication prescribed by Thorek even after a body scan revealed he still had shower hooks in his body. Farner repeatedly asked medical and psychological staff, including Dana and Szyhowski, for prescription pain medication, but he was only given weaker over-the-counter painkillers. [*Id.* at ¶¶ 42–44.]

On or around the night he was released from Thorek, Farner pulled the staples from his surgery out of his stomach and rubbed feces on the open wound. MCC sent him back to Thorek for treatment. Thorek recommended to MCC staff that Farner be placed in four-point restraints to protect him from further self-harm, including suicide attempts, but MCC did not. Instead, it placed Farner on suicide watch without four-point restraints. [*Id.* at ¶¶ 46–48.] Shortly after his return and while still on suicide watch, Farner was able to obtain a key while getting an x-ray at MCC, which he swallowed. MCC sent Farner back to Thorek for treatment. Thorek removed the key and Farner was sent back to MCC, again without four-point restraints. [*Id.* at ¶¶ 48–49.]

Back at MCC, medical staff supervised by Dr. Mohan failed to administer antibiotics and pain medication prescribed by Thorek to Farner. Days after returning from the hospital, Farner developed an infection and fever and experienced symptoms including vomiting and blood in his stool. Farner also developed a stomach abscess.

Mohan approved his emergency transfer to Rush University Hospital for treatment. On his return, Farner was again placed in a suicide watch cell without four-point restraints. [*Id.* at ¶¶ 50–53.] He was not referred for psychiatric care, although MCC staff were aware of his mental health condition and suicidal ideation. This includes Captain Matthew Avery, who supervised correctional officers at MCC and visited Farner's cell block multiple times per week. [*Id.* at ¶¶ 17, 54, 56.]

In late July 2021, Farner attempted suicide again by climbing onto a sink and diving head-first to the ground. He was treated for head and neck injuries at Northwestern Memorial Hospital and sent back to MCC, where he was returned to a suicide watch cell without four-point restraints. A few days later, Farner made a similar suicide attempt (his fifth since entering MCC). Farner was treated at Northwestern again, returned to MCC, and placed in four-point restraints for the first time at MCC. [*Id.* at ¶¶ 57–61.]

After being held in restraints overnight, MCC transferred Farner to Winnebago County Jail for seven days. While there, he was kept in a padded cell and placed in a restraint wrap. Farner was then airlifted to the Medical Center for Federal Prisoners in Springfield, Missouri, where he was treated and provided psychiatric care. [*Id.* at ¶¶ 62–64, 65.]

Farner initiated this action against eight MCC employees: MCC doctors Mohan and Nowakowski, MCC psychologists Conlon, Dana, and Szyhowski, and Captain Avery. He alleges that Defendants violated his Eighth Amendment rights

through deliberate indifference to his medical needs and failure to intervene in repeated suicide attempts.

## II.    Legal Standard

A motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of a plaintiff's claims. To survive a motion to dismiss under Rule 12(b)(6), "a complaint's factual allegations 'must be enough to raise a right to relief above the speculative level.'" *Emerson v. Dart*, 109 F.4th 936, 941 (7th Cir. 2024) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). Although the Court takes well-pleaded factual allegations as true, conclusory allegations as insufficient to avoid dismissal. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

## III.    Analysis

Defendants argue that the second amended complaint must be dismissed because a *Bivens* remedy is unavailable for Farner's claims and, alternatively, that qualified immunity protects them from suit.

### A.    Bivens Claims

A *Bivens* remedy is an implied cause of action for constitutional violations committed by federal officials and is generally a plaintiff's only recourse against federal employees acting under color of federal law. *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971); *Case v. Milewski*, 327 F.3d 564, 567 (7th Cir. 2003) ("[A]n action brought pursuant to § 1983 cannot lie against federal officers acting under color of federal law . . . ."). In *Bivens*, the Supreme Court first recognized this kind of cause of action against federal officials for a Fourth Amendment unreasonable search and arrest claim. *Bivens*, 403 U.S. at

395–97. It subsequently extended *Bivens* remedies to two other contexts: *Davis v. Passman*, 442 U.S. 228 (1979), recognized a congressional staffer's gender discrimination claim under the Due Process Clause of the Fifth Amendment and *Carlson v. Green*, 446 U.S. 14 (1980), recognized a federal prisoner's Eighth Amendment claim for failure to provide adequate medical care. Since *Carlson*, the Supreme Court has dramatically curtailed the recognition of implied causes of action, characterizing it as a "disfavored judicial activity" because of the tension it generates with Congress. *Egbert v. Boule*, 596 U.S. 482, 491 (2022) (quoting *Ziglar v. Abbasi*, 582 U.S. 120, 135 (2017)); *see also Hernández v. Mesa*, 589 U.S. 93, 100 (2020) ("'[T]here is no federal general common law' and therefore federal courts today cannot fashion new claims in the way that they could before 1938." (quoting *Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938))).

The Court has not recognized a new *Bivens* action since *Carlson*. But rather than dispense with *Bivens* altogether, the Court created a two-step inquiry to assess a proposed *Bivens* claim. First, a court asks whether the claim presents "a new *Bivens* context," meaning that it is "'meaningful[ly]' different from the three cases in which the Court has implied a damages action." *Egbert*, 596 U.S. at 492 (quoting *Ziglar*, 582 U.S. at 139). A difference is meaningful if it "involves a factual distinction or new legal issue that might alter the policy balance that initially justified the implied damages remedies in the *Bivens* trilogy." *Brooks v. Richardson*, 131 F.4th 613, 616 (7th Cir. 2025) (quoting *Snowden v. Henning*, 72 F.4th 237, 239 (7th Cir. 2023), *cert.*

7

*denied*, 145 S. Ct. 137 (2024)). Examples of ways in which a case might be meaningfully different include, but are not limited to:

> [T]he rank of the officers involved; the constitutional right at issue; the generality or specificity of the official action; the extent of judicial guidance as to how an officer should respond to the problem or emergency to be confronted; the statutory or other legal mandate under which the officer was operating; the risk of disruptive intrusion by the Judiciary into the functioning of other branches; or the presence of potential special factors that previous *Bivens* cases did not consider.

*Ziglar*, 582 U.S. at 140. A new category of defendants is also a meaningful difference. *Egbert*, 596 U.S. at 492. The new-context inquiry is generally "easily satisfied." *Ziglar*, 582 U.S. at 149; *see also id.* at 147 ("[E]ven a modest extension is still an extension."). At the same time, however, "trivial," *id.* at 149, or "narrow" factual differences do not make a cause of action "new," *Snowden*, 72 F.4th at 247.

If a claim doesn't present a new context, it may proceed under an existing *Bivens* remedy. But if it does, a court must ask whether there are "special factors indicating that the Judiciary is at least arguably less equipped than Congress to weigh the costs and benefits of allowing a damages action to proceed." *Egbert*, 596 U.S. at 492 (internal quotation marks and citation omitted). Even one "sound reason to defer to Congress" is enough to foreclose a new *Bivens* remedy. *Id.* at 491 (quoting *Nestlé USA, Inc. v. Doe*, 593 U.S. 628, 635 (2021) (plurality opinion)). "[S]eparation-of-powers considerations are decisive": the critical question is whether Congress or the courts are better suited to determine whether a damages remedy should be provided. *Snowden*, 72 F.4th at 239; *see Egbert*, 596 U.S. at 491–92. For instance, a new remedy is unsuitable if Congress has already provided or authorized the

executive branch to provide an alternative remedial structure, legislative action suggests that Congress does not want a damages remedy, or the claim at issue would require inquiry into sensitive issue areas firmly committed to other branches, like national security. *Ziglar*, 582 U.S. at 137, 141–42, 148–49. There is no exhaustive list of considerations that can foreclose a new *Bivens* remedy, for "no court could forecast every factor that might counsel hesitation." *Egbert*, 596 U.S. at 493 (cleaned up). The unpredictable systemwide consequences of recognizing a new cause of action alone may be a special factor. *Id.* Because the new context and special factor inquiries overlap, they often reduce to a single question: "whether there is any reason to think that Congress might be better equipped to create a damages remedy." *Egbert* at 492.

The Supreme Court has urged extreme caution in implying a *Bivens* action and new remedies are rarely recognized. *Id.* (noting that Congress will be better equipped to decide whether to provide a damages remedy "in almost every case"). "If there is even a single 'reason to pause before applying *Bivens* in a new context,' a court may not recognize a *Bivens* remedy." *Id.* at 493 (quoting *Hernández*, 589 U.S. at 102); *see also Goldey v. Fields*, 606 U.S. 942, 942–43 (2025) (per curiam) ("Those many post-1980 *Bivens* 'cases have made clear that, in all but the most unusual circumstances, prescribing a cause of action is a job for Congress, not the courts.'" (quoting *Egbert*, 596 U.S. at 486)).

Here, Farner alleges that Defendants violated his Eighth Amendment rights in three ways: deliberate indifference to his psychiatric needs; deliberate indifference to conditions leading to and failure to intervene in repeated suicide attempts; and

deliberate indifference to his medical needs leading to a stomach abscess (Counts I–III). Farner argues that a *Bivens* action is proper because his claims map onto *Carlson* and, even if they did present a new context, special factors don't counsel against a remedy. The court takes each claim in turn.

### 1. Psychiatric Care

Farner brings his first claim against psychologists Conlon, Dana, and Szyhowski, and Drs. Mohan and Nowakowski for deliberate indifference to his psychiatric needs. In sum, he alleges that although Defendants were aware of his psychiatric conditions (bipolar, borderline personality, and anti-social personality disorder, and PTSD), he was not required to take the forced medication regimen he had been given in prior facilities and was instead prescribed other less effective medication. [*Id.* at ¶¶ 26, 29.] For example, Farner's forced medication regimen included Prolixin, an antipsychotic drug, and other medication to manage Prolixin's side-effects.[2] [*Id.* at ¶ 20.] But Farner was not required to take these medications and Dr. Nowakowski instead prescribed him Olanzapine, a different type of antipsychotic drug.[3] [*Id.* at ¶ 28.] He also alleges that Defendants repeatedly failed to refer him to a psychiatrist when requested. [*Id.* at ¶ 30.] Farner claims that deliberate indifference to his psychiatric conditions negatively impacted his mental health and led to repeated suicide attempts. [*Id.* at ¶ 79.]

---

[2]     Prolixin is an antipsychotic used to treat the symptoms of schizophrenia. https://medlineplus.gov/druginfo/meds/a682172.html.
[3]     Olanzapine is an antipsychotic used to treat the symptoms of schizophrenia and bipolar disorder. https://medlineplus.gov/druginfo/meds/a601213.html.

The Eighth Amendment "protects prisoners from being subjected to unnecessary and wanton infliction of pain." *Brown v. LaVoie*, 90 F.4th 1206, 1211 (7th Cir. 2024) (internal quotation marks and citation omitted). A plaintiff states a claim of deliberate indifference to medical needs when he alleges that he "suffered from an objectively serious medical condition" and a defendant was "deliberately indifferent to that condition." *Id.* at 1212. "An absence of treatment is equally actionable whether the inmate's suffering is physical or psychological." *Mitchell v. Kallas*, 895 F.3d 492, 499 (7th Cir. 2018). The question here is whether a *Bivens* remedy exists for Farner's deliberate indifference claim. The Court finds that it does because Farner's claim doesn't present a new context.

In *Carlson*, the Supreme Court recognized a *Bivens* claim against prison medical staff and the Director of the Federal Bureau of Prisons for deliberate indifference to an inmate's medical needs. There, defendants were alleged to have provided inadequate care when they failed to timely respond to an inmate's asthma attack, administered contra-indicated medication, used a respirator known to be inoperative, and delayed transfer to an outside hospital, resulting in the inmate's death. 446 U.S. at 16 n.1.

In many respects, Farner's claim falls within *Carlson*'s ambit. He alleges the same Eighth Amendment violation—deliberate indifference to medical needs—against individuals of the same rank and type, namely MCC medical personnel responsible for his direct treatment (Conlon, Dana, Szyhowski, and Nowakowski), and a medical supervisor (Mohan). *See Brooks*, 131 F.4th at 615 (clarifying that

11

*Bivens* actions based on *Carlson* are available against supervisors even if they may fail on the merits).

Farner also alleges deliberate indifference at the same level of specificity as alleged in *Carlson*. He points to specific acts and omissions, including that each Defendant refused to refer him to a specialist to treat diagnosed psychiatric conditions of which Defendants were aware, and which Farner alleges caused him to attempt suicide five times in less than two months. *See Council v. Sacchetti*, 2023 WL 2526263, at *2 (S.D. Ind. Mar. 14, 2023) ("[P]sychiatric conditions and psychological distress may qualify as serious medical conditions for the purposes of the Eighth Amendment." (citing *Antonelli v. Sheahan*, 81 F.3d 1422, 1432 (7th Cir. 1996))); *Love v. Ill. Dep't of Corr.*, 2020 WL 1237200, at *5 (N.D. Ill. Mar. 13, 2020) (holding that bipolar disorder may be sufficiently serious to satisfy an Eighth Amendment deliberate indifference claim). He also alleges that Dr. Nowakowski was aware of his medical history but refused to refer him to a psychiatrist, and instead prescribed less effective medication than he had been prescribed previously without consulting a psychiatrist. *See Arnett v. Webster*, 658 F.3d 742, 754 (7th Cir. 2011) (holding that "allegations that the medical defendants knowingly ignored [plaintiff's] complaints of pain by continuing with a course of treatment that was ineffective and less efficacious without exercising professional judgment" are sufficient to state a deliberate indifference claim). The court does not consider Farner's allegation that MCC staff also declined to follow his forced medication regimen because he didn't specify who

made that decision. But Farner's other allegations describe specific acts that are sufficiently similar in degree to those in *Carlson*.

There is also ample judicial precedent on inadequate medical care claims, including claims involving a refusal to provide medication or medical services, and significant delays in care of both physical and psychiatric conditions. *See, e.g.*, *Farmer v. Brennan*, 511 U.S. 825 (1994) (clarifying the deliberate indifference standard for Eighth Amendment claims); *Kallas*, 895 F.3d at 499 (holding that "absence of treatment is equally actionable whether the inmate's suffering is physical or psychological"); *Cesal v. Moats*, 851 F.3d 714, 721 (7th Cir. 2017) (holding that an inmate stated a deliberate indifference claim for failure to diagnose and timely treat a back injury); *Meriwether v. Faulkner*, 821 F.2d 408, 412–13 (7th Cir. 1987) (holding that an inmate stated a § 1983 claim for deliberate medical indifference for medical issues caused by gender dysphoria). These provide prison officials with detailed guidance on how to respond to an inmate's serious medical condition. Given the substantive similarities between *Carlson* and Farner's claims and wealth of precedent on these contexts, this claim doesn't present a greater risk of intrusion into BOP's operations than *Carlson* permitted.

There are some clear factual differences between *Carlson* and Farner's claims. *Carlson* mainly concerned a medical problem that lasted eight hours and resulted in death, 466 U.S. at 16 n.1, whereas Farner's medical issues at MCC spanned about two months and resulted in multiple non-fatal suicide attempts. But the Seventh Circuit recently clarified that *Carlson* "also dealt with management of a chronic, non-

13

emergent medical condition requiring continuous, periodic treatment over many months, as well as all the administrative decisions that such treatment necessarily entails," making it more similar to Farner's case. *Watkins v. Mohan,* — F. 4th —, 2025 WL 1947500, at *5 (7th Cir. July 16, 2025). Regardless of the precise scope of *Carlson*, factual differences concerning the "duration of the poor care [and] the gravity of the condition" bear on the merits of a claim, not whether a cause of action is available. *Brooks*, 131 F.4th at 615.

Defendants argue that a number of other factors make the context here novel. First, they allege that *Carlson* addressed inadequate medical care, not mental health care, and that this is a meaningful difference. Many courts recognize that a *Bivens* action for deliberate indifference need not raise the same type of medical issue as presented in *Carlson*, which concerned an asthma attack. *See, e.g.*, *id.* (holding that deliberate indifference to appendicitis is not a new *Bivens* context); *Watanabe v. Derr*, 115 F.4th 1034, 1039–42 (9th Cir. 2024) (same for injuries sustained in a physical fight); *Stanard v. Dy*, 88 F.4th 811, 817–18 (9th Cir. 2023) (same for Hepatitis C). The case Defendants cite to distinguish medical and mental health conditions, *DeBenedetto v. Salas*, 2023 WL 6388127 (N.D. Ill. Sept. 29, 2023), does not stand for that proposition; the court in *DeBenedetto* held that a deliberate indifference claim premised on inadequate mental health treatment presented a new context because the injury alleged arose from the conditions of confinement rather than deliberate indifference to medical needs. *Id.* at *6. Here, Farner's claim is not premised on his housing conditions, but rather on Defendants' denial of medical treatment.

Defendants also argue that the Seventh Circuit's recent decision in *Watkins* reinforces a distinction between medical and mental health conditions for *Bivens* purposes. [Dkt. 85.] They claim that because *Watkins* stated that a *Bivens* remedy has been recognized for "constitutionally inadequate *medical* care," but did not mention *mental health* care, the latter must be meaningfully different. [Dkt. 85 at 2.] But *Watkins* did not draw a distinction between medical and mental health care. Nor did it have a reason to because it concerned a hernia surgery, not a mental or psychiatric condition. 2025 WL 1947500, at *1. While *Watkins* did describe *Carlson's* holding as recognizing *Bivens* remedies for claims of "constitutionally deficient medical care," *id.* at *4, the court is hesitant to read "medical" as necessarily excluding "mental" or "psychiatric" care. This is a semantic argument that *Watkins* didn't address. And contrary to Defendants' position, many cases considering Eighth Amendment deliberate indifference claims use "medical" and "mental" or "psychiatric" interchangeably. *See, e.g.*, *Whitaker v. Dempsey*, — F.4th —, 2025 WL 1943948, at *11 (7th Cir. 2025) (holding that risk of suicide is an objectively serious medical condition); *Sanville v. McCaughtry*, 266 F.3d 724, 740–41 (7th Cir. 2001) (same); *Campbell v. Kallas*, 936 F.3d 536, 545 (7th Cir. 2019) (describing gender dysphoria as both a serious medical and psychiatric condition); *Love*, 2020 WL 1237200, at *5 (holding that refusal to provide psychiatric medication can constitute deliberate indifference to a serious medical need). If there is a constitutionally meaningful difference between medical and mental health care, it is not apparent from existing precedent. The court sees no other reason to distinguish inadequate

treatment of serious, diagnosed psychiatric conditions requiring medication from traditional medical care.[4]

Second, Defendants argue that Farner's claim implicates "BOP policies and procedures, including resource allocation (such as timing decisions on when to send an inmate for outside care), staffing, and housing decisions to address mental health care that were not implicated in *Carlson*." [Dkt. 84 at 3.] However, the fact that a *Bivens* action may implicate medical resources such as scheduling decisions or available staff and medication is "a defense on the merits rather than a potentially different context." *Brooks*, 131 F.4th at 616 ("All medical resources . . . are constrained . . . . If ranking low on a triage calculus is what happened to Brooks, then the defendants may have a good substantive response to his suit (because concern for the needs of other prisoners is not 'indifference' to a prisoner's pain)."); *see also Watkins*, 2025 WL 1947500, at *5 ("To the extent that Watkins' claims implicate administrative considerations regarding scheduling, outside consultation, or prison assignment, that would not remove them from *Carlson's* ambit."). As to housing decisions, Count I doesn't challenge where or how Farner was housed, but rather Defendants' decision to deny his request to see a medical specialist and prescribe less effective medication without consulting a specialist.

Finally, Defendants argue that any claims against Dr. Mohan based on his decisions as a supervisor cannot survive because "*Bivens* does not create vicarious liability." [Dkt. 84 at 7 (quoting *Brooks*, 131 F.4th at 615).] While it is true that *Bivens*

---

[4]    Even if mental health care were meaningfully different from medical care, Defendants are entitled to qualified immunity on this claim. *See infra*, Part III.B.

actions require a showing of personal involvement, Farner does allege that Dr. Mohan personally refused to refer him to a psychiatrist when asked. [Dkt. 74, ¶ 30.] At this stage, this is sufficient to state a claim against Dr. Mohan, but for the court's qualified immunity analysis discussed below.

### 2. Suicide Attempts

Next, Farner brings Eighth Amendment claims against psychologists Dana and Szyhowski, Dr. Mohan, and Captain Avery for deliberate indifference to his medical needs leading to and failure to intervene in repeated suicide attempts. Farner alleges that Defendants failed to put him in four-point restraints even though a medical doctor at Thorek recommended them to prevent Farner from harming himself. These omissions made possible Farner's multiple suicide attempts.[5] [Dkt. 74, ¶¶ 93–101.]

This presents a new *Bivens* context, whether styled as a deliberate indifference or failure to intervene claim. *Carlson* is the closest analogue as an Eighth Amendment case, but the same constitutional amendment does not necessarily present the same context. *Hernández*, 589 U.S. at 103. As a deliberate indifference claim, Farner's allegations present a new context because the mechanism of injury is

---

[5]    Farner's complaint also alleges that Conlon violated his Eighth Amendment rights when he allowed Farner to return to a single cell without a cellmate and failed to place him on suicide watch even though he knew that Farner was contemplating suicide. [Dkt. 74, ¶ 97.] But Farner failed to defend this claim in his response brief, so it is waived. Even if he had, the court would conclude that this claim raises a new context because the mechanism of injury is Farner's housing assignment, not medical care. Even if his housing conditions exacerbated or enabled his suicidal ideation, recognizing a new *Bivens* remedy would implicate MCC housing policies. This is substantially different from the context in *Carlson* and would threaten a greater risk of intrusion on other branches than *Carlson* condoned. *Sargeant v. Barfield*, 87 F.4th 358, 367 (7th Cir. 2023), *cert. denied*, 145 S. Ct. 285 (2024). Count III is dismissed against Conlon.

not inadequate medical care as in *Carlson*, but insufficient conditions of confinement. Accordingly, the crux of the injury implicates different policy considerations than were at issue in *Carlson* (housing as opposed to medical policies) and would require reweighing the costs and benefits of extending a remedy. Even if a failure to place Farner in four-point restraints contributed to his mental decline, these considerations are enough to differentiate Farner's claims from the claims of inadequate hands-on medical care at issue in *Carlson*. *See Skyberg v. James*, 2025 WL 1672871, at *2 (7th Cir. June 13, 2025) (holding that *Bivens* claims arose in a new context because the decision not to quarantine plaintiff during the COVID-19 pandemic affected his conditions of confinement, not the adequacy of his medical care); *Sargeant*, 87 F.4th at 364 (holding that a challenge to prison housing assignments presented a new context because it implicated non-medical decisions); *DeBenedetto*, 2023 WL 6388127, at *6 (holding that *Bivens* claim arose in a new context where plaintiff challenged his solitary confinement conditions rather than his medical care).

As a failure to intervene claim, Count III fares no better because the Seventh Circuit has already declined to extend *Bivens* to a similar failure to protect claim brought under the Eighth Amendment. *See Sargeant*, 87 F.4th at 361, 367 (declining to recognize *Bivens* remedy for failure to protect claim where prison official was alleged to have housed plaintiff with cellmates known to be violent). In reaching this decision, *Sargeant* first noted that the Supreme Court had not already recognized a *Bivens* remedy for such claims, *id.* at 364–65, and then determined that the claim before it presented a new context because it implicated "housing policies, which factor

in a sensitive mixture of things [the court is] ill-positioned to assess—a prison's determinations about safety, discipline, and resources," *id.* at 367. Farner's claim similarly challenges MCC's decisions about how to confine him, which raises the same complex housing determinations at play in *Sargeant*. Consequently, Count III presents a new context.

The Eighth Amendment claim lodged against Captain Avery also presents a novel context because he falls within a new category of defendants. In *Carlson*, the defendants were a chief medical officer, nurse, and Director of the Federal Bureau of Prisons. By contrast, Captain Avery is a correctional officer—he is non-medical staff and of a meaningfully lower rank than the Director of the Federal Bureau of Prisons. *See Berry v. Golden*, 2024 WL 2862294, at *4 (D. Conn. June 6, 2024) (holding that correctional officers were a new category of defendants for an Eighth Amendment deliberate indifference claim); *Edwards v. Gizzi*, 2022 WL 309393, at *7 (S.D.N.Y. Feb. 2, 2022) (same).

Special factors counsel against recognizing a new *Bivens* remedy for Count III, whether framed as a deliberate indifference or failure to intervene claim. The nuanced policy considerations discussed above also play a role at this stage of the *Bivens* analysis because they implicate separation of powers concerns. *See Sargeant*, 87 F.4th at 366 ("The reason that a distinction might alter the cost-benefit balance struck in an original *Bivens* case (step one) can also be the reason why Congress might be better positioned to create a remedy in the hope of deterring unconstitutional conduct (step two)."). *Carlson* didn't consider the economic and

administrative consequences of providing a remedy for an Eighth Amendment claim that challenges BOP's housing policies. Given that "a court likely cannot predict the 'systemwide' consequences" of recognizing a new *Bivens* action, this is a task better suited to Congress. *Egbert*, 596 U.S. at 493.

The presence of alternative remedial schemes also cuts against a new *Bivens* remedy. An "alternative, existing process for protecting the injured party's interest" alone can foreclose a new *Bivens* cause of action, *Ziglar*, 582 U.S. at 137 (cleaned up), "even if such 'procedures are not as effective as an individual damages remedy,'" *Goldey*, 606 U.S. at 945 (quoting *Egbert*, 596 U.S. at 498).[6] As Defendants note, someone in Farner's position could seek a remedy through BOP's administrative remedy program, 28 C.F.R. § 542.10, BOP's Internal Affairs Office, or the Department of Justice's Office of Inspector General. [Dkt. 79 at 12.] The existence of these remedial schemes convinces the court that it should not provide a new, freestanding remedy. *See, e.g.*, *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 74 (2001) (declining to recognize a *Bivens* action in part because prisoners had access to BOP's administrative remedy program); *Sargeant*, 87 F.4th at 368 (same).[7] Consequently, a *Bivens* remedy is not available for Count III and the claim is dismissed.

---

[6]     Farner argues that alternative remedial procedures should not block his *Bivens* claim because BOP's grievance process was unavailable to him. [Dkt. 81 at 15.] But for the purposes of *Bivens*, a court only asks whether Congress is better equipped to create or augment a remedy, not whether that remedy would provide full relief. *Sargeant*, 87 F.4th at 368; *Skyberg*, 2025 WL 1672871, at *3 ("[W]e only consider whether there is a reason why Congress is better positioned to assess the need for a remedy, not whether that remedy is functionally available.").

[7]     The Supreme Court has also found it significant that the Prison Litigation Reform Act of 1995 ("PLRA"), which altered how prisoners may bring claims in federal court, did not

### 3.    Stomach Abscess

Farner's final Eighth Amendment claim against psychologists Dana and Szyhowski, Dr. Mohan, and Captain Avery states a straightforward claim for deliberate indifference to his medical needs leading to an abscess in his stomach. He alleges that, following his surgery at Thorek Memorial Hospital, MCC medical staff supervised by Dr. Mohan failed to give him antibiotics and pain medication prescribed by Thorek medical staff after he removed surgical staples from his stomach and rubbed feces on his wound. He thereafter developed an infection that was left untreated even though he experienced serious symptoms including a fever, vomiting, and blood in his stool. Farner was only treated when the infection, which caused a stomach abscess, became so severe that he required an emergency transfer to Rush University Hospital. [Dkt. 74, ¶¶ 50–52.]

As above, Farner's claim against Captain Avery presents a new context because he belongs to a new category of defendants—federal correctional officers. *Berry*, 2024 WL 2862294. And as above, the existence of an alternative remedial scheme forecloses a new *Bivens* remedy. *Ziglar*, 582 U.S. at 137. Count II is dismissed as to Captain Avery.[8]

---

provide for damages remedies in new contexts. Although it did not foreclose *Bivens* actions, "it could be argued that" this omission means that "Congress chose not to extend the *Carlson* damages remedy to cases involving other types of prisoner mistreatment." *Ziglar*, 582 U.S. at 149; *see also Sargeant*, 87 F.4th at 367–68.

[8]    Farner's claim against Captain Avery also fails because he did not allege how he was indifferent to his infection or stomach abscess. Rather, all of Farner's allegations against Captain Avery relate to Farner's suicidal ideation and need to be restrained. [*See* Dkt. 74, ¶¶ 24, 56–57, 59.]

Farner's claim does not present a new context as to the remaining defendants. He alleges that medical staff and a medical supervisor refused to provide prescribed antibiotics, leading to a stomach abscess so severe that Farner was vomiting, had blood in his stool, and required transfer by ambulance to a hospital. This qualifies as an objectively serious medical need because "even a lay person would easily recognize the necessity for a doctor's attention." *King v. Kramer*, 680 F.3d 1013, 1018 (7th Cir. 2012). A *Bivens* remedy is available, but only against defendants that Farner has alleged to be personally involved in his injuries—here, there are none. *Arnett*, 658 F.3d at 757 (*Bivens* liability only attaches to a federal official if he has direct, personal involvement in the violation).

Farner failed to allege that Defendants Dana and Szyhowski were involved in the alleged wrongdoing that caused his stomach abscess. He alleges that they refused to give him prescribed pain medication after his initial surgery at Thorek Hospital. [Dkt. 74, ¶ 44.] But he does not allege that Dana or Szyhowski personally denied him pain medication or antibiotics after he removed his surgical staples, which precipitated his infection. Although the parties did not brief this issue, it is abundantly clear that Farner's claims against Dana and Szyhowski are insufficient as a matter of law, so the court dismisses them. *See, e.g.*, *Garrett v. Sharps Compliance, Inc.*, 2010 WL 4167157, at *2 (N.D. Ill. Oct. 14, 2010) (dismissing claim sua sponte for lack of specific allegations against certain defendants).

Farner also failed to allege that Dr. Mohan was personally involved in Farner's injuries because each allegation made is based on Dr. Mohan's decisions as a

supervisor. At most, he claims that Dr. Mohan "was only willing to approve Mr. Farner's transfer to a hospital" once his condition became a medical emergency. [Dkt. 74, ¶ 52.] But approving a medical transfer is a supervisory decision. Farner did not allege that before the transfer, Dr. Mohan himself inadequately provided or failed to provide him with medical care, so no *Bivens* liability can attach. *See Brooks*, 131 F.4th at 616 (dismissing deliberate indifference *Bivens* claim against medical supervisors who did not directly treat the plaintiff).

In sum, a *Bivens* remedy is available for Count I, so the court proceeds to Defendants' qualified immunity defense. The motion to dismiss is granted as to Counts III and II for lack of a *Bivens* remedy and failure to plead personal involvement as to any Defendant, respectively.

### B. Qualified Immunity

The remaining defendants—Conlon, Dana, Szyhowski, and Drs. Mohan and Nowakowski—raise a qualified immunity defense on Count I, deliberate indifference to Farner's psychiatric conditions leading to multiple suicide attempts. The doctrine of qualified immunity "shields officials from civil liability so long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Smith v. Kind*, 140 F.4th 359, 365 (7th Cir. 2025) (quoting *Mullenix v. Luna*, 577 U.S. 7, 11 (2015)). Qualified immunity provides "breathing room to make reasonable but mistaken judgments about open legal questions," and protects "all but the plainly incompetent or those who knowingly violate the law." *Ziglar*, 582 U.S. at 150–52 (internal citations and quotation marks omitted).

23

Once a qualified immunity defense is raised, "it becomes the plaintiff's burden to defeat it." *Smith*, 140 F.4th at 365 (quoting *Jewett v. Anders*, 521 F.3d 818, 823 (7th Cir. 2008)). To overcome qualified immunity, a plaintiff must show that (1) the official violated his constitutional rights, and (2) the right was clearly established at the time of the violation. *Id.* The court only addresses the second prong because it is dispositive. *Id.* ("Courts have discretion to begin with the second step . . . .").

"To be clearly established," a constitutional right "must have a sufficiently clear foundation in then-existing precedent." *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018). The Supreme Court has repeatedly stressed that a constitutional right must be defined at a sufficient level of specificity to give federal officials notice of the bounds of the right. *Id.* ("The rule's contours must be so well defined that it is clear to a reasonable officer that his conduct was unlawful in the situation he confronted. This requires a high degree of specificity." (internal quotation marks and citations omitted)); *see also Kisela v. Hughes*, 584 U.S. 100, 104 (2018). While a plaintiff need not identify a case that is "directly on point," it must be similar enough that the constitutional question is "beyond debate." *Wesby*, 583 U.S. at 64 (quoting *Ashcroft v. al–Kidd*, 563 U.S. 731, 741 (2011)).

Farner fails to clear this "high bar." *Smith*, 140 F.4th at 370. He points to *Estate of Clark* for the proposition that it was clearly established at the time of his injuries that an inmate had the right to be free from deliberate indifference towards a mental illness or suicide risk. [Dkt. 81 at 19 (citing *Estate of Clark v. Walker*, 865 F.3d 544, 553 (7th Cir. 2017)).] But Farner defines the right in *Estate of Clark* too

24

generally, for cases following *Estate of Clark* agree that it only applies where the prison official(s) "chose to do nothing" in response to a known risk of substantial harm to the inmate. *See, e.g., Campbell*, 936 F.3d 536, 548 (7th Cir. 2019) (quoting *Estate of Clark*, 865 F.3d at 553); *Chilcutt v. Santiago*, 2023 WL 4678583, at *4 (7th Cir. July 21, 2023). The Defendants here did not "do nothing"—they placed Farner on suicide watch multiple times, provided psychological counseling sessions, and prescribed him at least one medication. It's plausible that the care provided was not constitutionally adequate, *see, e.g., Kallas*, 895 F.3d at 499 (observing that psychological counseling is not a constitutionally adequate substitute for medicated psychiatric conditions). But *Estate of Clark* does not put that constitutional question "beyond debate." The second case Farner cites, *Viero v. Bufano*, similarly addressed claims that medical staff failed to take any steps to address an inmate's mental health needs and suicide risk. [Dkt. 81 at 19 (citing *Viero v. Bufano*, 901 F. Supp. 1387, 1394–95 (N.D. Ill. 1995)).] Neither case squarely addresses the facts at issue here and so cannot defeat Defendants' qualified immunity defense.

## IV.     Conclusion

For the reasons above, the motion to dismiss the second amended complaint [Dkt. 78] is granted. While a *Bivens* remedy exists against certain Defendants on Count I, they are entitled to qualified immunity. Count III is dismissed because it presents a new context and a *Bivens* remedy is not appropriate. Count II is dismissed because Farner failed to allege that any Defendant was personally involved in the injuries alleged. The second amended complaint [Dkt. 74] is dismissed without prejudice. Though this is his second amended complaint, it is the first time his claims have been adversarially tested, so Farner will have one final opportunity to amend.

Enter: 23-cv-1767
Date: July 31, 2025

_____
Lindsay C. Jenkins