**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| JOSHUA S. FARNER, | |
| Plaintiff, | |
| vs. | Case No. 23-cv-1767 |
| KRISTIN CONLON, in her individual capacity; JASON DANA, in his individual capacity; BRIJ MOHAN, in his individual capacity; BONNIE NOWAKOWSKI, in her individual capacity; and DAVE SZYHOWSKI, in his individual capacity; | District Judge Lindsay C. Jenkins<br><br>Magistrate Judge David Weisman |
| Defendants. | |

**THIRD AMENDED COMPLAINT**

Plaintiff Joshua S. Farner, by his counsel, brings these claims for damages and other relief against Defendants KRISTIN CONLON, in her individual capacity; JASON DANA, in his individual capacity; BRIJ MOHAN, in his individual capacity; BONNIE NOWAKOWSKI, in her individual capacity; and DAVE SZYHOWSKI, in his individual capacity.

**INTRODUCTION**

1. This action arises from constitutionally inadequate medical care that Mr. Farner received during his incarceration at the Metropolitan Correctional Center located at 71 W. Van Buren Street, Chicago, Illinois 60605 ("MCC Chicago").

2. At the time of his transfer to MCC Chicago, and at all relevant times during the events alleged, Mr. Farner was serving time for state crimes[1] and was thus classified as a convicted inmate transferred to federal custody.[2]

---

[1] *See* Joshua S. Farner's Illinois Department of Corrections profile (IDOC No. B84713), disclosing a June 19, 2015 admission date and January 13, 2026 parole date for three convictions from 2014.

[2] *See* 28 C.F.R. § 551.101, defining a pre-trial inmate as a person who is legally detained but for whom the Bureau of Prisons has not received notification of conviction, and excluding, individuals who are at the same time of their detention, serving a state or federal sentence.

3.      Upon his arrival at MCC Chicago in or around June 2021, Mr. Farner informed MCC Chicago personnel of his medical history of bipolar disorder, borderline personality disorder, post-traumatic stress disorder, and anti-social personality disorder, along with his plan to commit suicide.  MCC Chicago personnel initially placed Mr. Farner on suicide watch during his first night at the facility, but ultimately released him to general population, which enabled Mr. Farner to attempt suicide by swallowing a bed-frame hook and razor blades that he would not have been able to access if he had remained on suicide watch.

4.      Throughout the remainder of his incarceration at MCC Chicago, Mr. Farner continued to attempt suicide—including by swallowing shower hooks while hospitalized for treatment of the wounds he experienced after his initial attempt, along with multiple attempts to dive off a sink head-first.  Despite those repeated suicide attempts and Mr. Farner's deteriorating mental state, MCC Chicago did not provide Mr. Farner with adequate medical treatment, such as pain medication for his wounds or psychiatric treatment for his suicidal ideation, leading to further deterioration of his mental state.  Indeed, MCC Chicago medical records from August 9, 2021 report that ████████████████████████████████████████ ████████████████████████████████

5.      Defendants were maliciously, intentionally, deliberately, and/or recklessly indifferent to and/or in disregard of Mr. Farner's medical needs by ignoring his repeated requests for medical treatment and by refusing Mr. Farner psychiatric support or placing him in restraints when he proved to be an ongoing harm to himself.

6.      MCC's indifference and/or disregard for Mr. Farner's medical needs violated Mr. Farner's Eighth Amendment right to be free from cruel and unusual punishment under the U.S. Constitution.

2

7.      Mr. Farner seeks damages for the harm he has suffered due to Defendants' constitutional violations, along with such other relief as the Court deems just and proper.[3]

## JURISDICTION AND VENUE

8.      This action arises under the Constitution and laws of the United States. Mr. Farner brings this action against Defendants under *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971). This Court has jurisdiction under 28 U.S.C. § 1331.

9.      Pursuant to 28 U.S.C. § 1391(b)(1), venue is proper in this judicial district because Defendants are all residents of the State of Illinois, and at least one Defendant resides within this judicial district.

10.     Pursuant to 28 U.S.C. § 1391(b)(2), venue is also proper in this judicial district because a substantial part of the events or omissions giving rise to the claims herein occurred in this judicial district.

## PARTIES

11.     Mr. Farner is a natural person and citizen of Illinois. At relevant times herein mentioned, Mr. Farner was an inmate at MCC Chicago. MCC Chicago is a facility of the Federal Bureau of Prisons ("BOP"), which is an agency of the U.S. government.

12.     At relevant times herein mentioned, Defendant Kristin Conlon ("Conlon") was, and on information and belief continues to be, an employee of the BOP and a psychologist at MCC Chicago. As to all claims presented against her, Defendant Conlon is being sued in her individual capacity for damages. At all relevant times, Defendant Conlon has acted or failed to act under color of federal law.

---

[3] In accordance with this Court's rules on amended complaints, attached hereto as Exhibit A is a redline comparing the Third Amended Complaint to the Second Amended Complaint (Dkt. 74).

13. At relevant times herein mentioned, Defendant Jason Dana ("Dana") was an employee of the BOP and a psychologist at MCC Chicago. As to all claims presented against him, Defendant Dana is being sued in his individual capacity for damages. At all relevant times, Defendant Dana has acted or failed to act under color of federal law.

14. At relevant times herein mentioned, Defendant Brij Mohan ("Mohan") was, and on information and belief continues to be, an employee of the BOP and a medical doctor at MCC Chicago. As to all claims presented against him, Defendant Mohan is being sued in his individual capacity for damages. At all relevant times, Defendant Mohan has acted or failed to act under color of federal law.

15. At relevant times herein mentioned, Defendant Bonnie Nowakowski ("Nowakowski") was, and on information and belief continues to be, an employee of the BOP and a medical doctor at MCC Chicago. As to all claims presented against her, Defendant Nowakowski is being sued in her individual capacity for damages. At all relevant times, Defendant Nowakowski has acted or failed to act under color of federal law.

16. At relevant times herein mentioned, Defendant Dave Szyhowski ("Szyhowski") was, and on information and belief continues to be, an employee of the BOP and a psychologist at MCC Chicago. As to all claims presented against him, Defendant Szyhowski is being sued in his individual capacity for damages. At all relevant times, Defendant Szyhowski has acted or failed to act under color of federal law.

## FACTUAL ALLEGATIONS

### A. Defendants Were On Notice of Mr. Farner's Severe Mental Health Problems On Or Around The Time He Arrived At MCC Chicago

17. Prior to June 2021, Mr. Farner was incarcerated at Dixon Correctional Center, a facility within the Illinois Department of Corrections ("IDOC") serving time for state convictions dating back to 2015. In or around June 2021, Mr. Farner was transferred from Dixon Correctional

4

Center's Mental Health Unit (called the "Residential Treatment Unit")—in the highest security classification (Level E) —to MCC Chicago.

18.     Prior to his arrival at MCC Chicago, Mr. Farner had received diagnoses of bipolar disorder, borderline personality disorder, post-traumatic stress disorder, and anti-social personality disorder.  Psychiatrists and forensic psychologists had made those diagnoses over the course of several years prior to Mr. Farner's incarceration at MCC Chicago, including while Mr. Farner was in IDOC custody.

19.     In fact, MCC's records confirm that as early as June 1, 2021, MCC Chicago was on notice of Mr. Farner's Borderline Personality Disorder, PTSD, and Bipolar Disorder diagnoses. Mr. Farner's MCC Chicago records also make clear that he required ███████████ of particular medications to help manage the symptoms of those psychiatric illnesses, and that he suffered from ████████████████████████████████████ ██████████████████████.

20.     Mr. Farner's diagnoses required a "forced medication" regimen that was prescribed to Mr. Farner by an IDOC treatment review committee consisting of psychiatrists and psychologists.  "Forced medication" regimens refer to prescribed medications that inmates are not allowed to refuse; medical staff at IDOC were required to force Mr. Farner to take medications that were part of the regimen.  Mr. Farner had been involuntarily taking the medications required under that forced medication regimen since around 2016 or 2017, which included Mr. Farner's receiving shots of Prolixin (an anti-psychotic drug) approximately twice a month.  Mr. Farnker had also been taking Cogentin pills on a more frequent basis to treat side effects of Prolixin during that same time period.

21.     On or around Mr. Farner's arrival to MCC Chicago, he met with Correctional Counselor Russell, who served as an inmate liaison and performed Mr. Farner's clinical intake.

5

During that meeting, Mr. Farner informed Correctional Counselor Russell of his general medical history and that he was contemplating suicide.

22.     Correctional Counselor Russell informed psychologists at the facility of what she learned during Mr. Farner's clinical intake, and MCC Chicago placed Mr. Farner on "Care Level 3" around the time of his arrival at MCC Chicago.  "Care Level 3" inmates are required to have weekly visits from a BOP psychologist and are also allowed to have additional treatment sessions with a BOP psychologist upon request.  Care Level 3 inmates are also required to see a psychiatry specialist at least once per month.[4]

23.     Care Level 3 inmates are also generally required to have a cellmate while incarcerated in a general housing unit at MCC Chicago.  Defendant Conlon stated this should have been the case for Mr. Farner in her July 8, 2021 ██████████████████████████ ██████████████████████████████████████

24.     Those diagnoses and the forced medication regimen were reflected in Mr. Farner's medical records, which Defendants and other employees at MCC Chicago were able to access during Mr. Farner's incarceration at the facility.  Medical records for inmates who are housed at "Care Level 3" are transferred fairly quickly on or before each respective inmate's arrival at the facility.

25.     Mr. Farner believes that MCC Chicago had received full copies of his medical records and that MCC Chicago staff had the opportunity to review them because medical and mental health staff at MCC Chicago knew about Mr. Farner's forced medication regimen without his disclosing it.

---

[4] This requirement was relayed to Mr. Farner by a BOP psychologist during Mr. Farner's recent incarceration at the Federal Medical Center in Devens, Massachusetts.

**B.** **MCC Chicago Discontinued Mr. Farner's Forced Medication Regimen And Failed To Refer Him To A Psychiatrist, Despite His "Care Level 3" Status**

26. Throughout Mr. Farner's incarceration at MCC Chicago, Defendants Conlon and Dana generally handled his mandatory weekly psychology sessions, with Mr. Farner mostly seeing Defendant Conlon in or around the first month of his time at MCC Chicago.

27. Around the time of his arrival at MCC Chicago, MCC Chicago medical staff tried to give him shots of Prolixin but Mr. Farner refused the treatment. MCC Chicago's medical staff were supervised by Defendant Mohan. Despite the fact that Prolixin was part of the forced medication regimen that Mr. Farner was not allowed to refuse, Mr. Farner was not required to take the medication. Indeed, Defendant Dana told Mr. Farner in or around late June or early July 2021 that MCC Chicago did not intend to require Mr. Farner to continue following his still-effective forced medication regimen.

28. MCC Chicago failed to follow Mr. Farner's forced medication regimen during his incarceration at the facility.

29. Despite overseeing the medical unit at MCC Chicago and having access to records showing that Mr. Farner had extensive psychiatric problems and "Care Level 3" status, Defendant Mohan never authorized Mr. Farner to see or receive treatment from a psychiatry specialist. Mr. Farner also saw Defendant Nowakowski (a general medical practitioner) during his incarceration at MCC Chicago, and Mr. Farner repeatedly told Defendant Nowakowski that he wanted to receive psychiatric care. Defendant Nowakowski nonetheless failed to refer Mr. Farner to a psychiatrist, and instead added a medication called Olanzapine to his medication list without consulting a psychiatrist.

30. When Mr. Farner had the opportunity to receive treatment from psychiatric specialists at other facilities, they prescribed different medications that were more effective at stabilizing his mood and treating his mental health problems.

7

31.     Throughout his incarceration at MCC Chicago, Mr. Farner asked Defendants Conlon, Dana, Szyhowski, Mohan, and Nowakowski for a referral to a psychiatrist.  None of those Defendants granted Mr. Farner's requests, despite his severe history of psychiatric problems and ongoing mental health problems at MCC Chicago.

**C.     As A Result Of Defendants' Constitutionally Inadequate Medical Care, Mr. Farner Began To Attempt Suicide On Or Around July 14, 2021**

32.     After his clinical intake with Correctional Counselor Russell upon his arrival at MCC Chicago, Defendant Dana placed Mr. Farner in a suicide watch cell for one night.  The following day, Defendant Dana placed Mr. Farner on quarantine, where Mr. Farner was supposed to have a cellmate due to his Care Level 3 status.  Despite that requirement, Mr. Farner was only placed with a cellmate during part of his time in quarantine.

33.     MCC Chicago transferred Mr. Farner to a general population unit after approximately two weeks in quarantine, and his mental state proceeded to deteriorate as evidenced by MCC's records.  In his July 8, 2021 psychological service notes, Defendant Dana stated that

34.     Despite Dr. Dana's conclusion, Defendants did not provide Mr. Farner with psychiatric treatment (inpatient or otherwise).

35.     After about a month in general population, Mr. Farner requested a visit from Defendant Conlon, with whom he met on or around July 14, 2021.  Prior to that session, Mr. Farner

had been meeting with Defendant Conlon about twice a week, including to discuss his ongoing mental health issues.

36. During the session that took place on or around July 14, 2021, Defendant Conlon discussed Mr. Farner's suicidal ideation and asked if he had a suicide plan. Mr. Farner confirmed he did, disclosing that he planned to swallow razor blades. Despite learning of Mr. Farner's suicide plan, Defendant Conlon sent Mr. Farner back to his general population cell without placing him on suicide watch.

37. Defendant Conlon did not provide any explanation as to why she failed to place Mr. Farner on suicide watch. At a subsequent point during Mr. Farner's incarceration at MCC Chicago, Defendant Dana told Mr. Farner that Defendant Conlon erred in not placing Mr. Farner on suicide watch sooner.

38. MCC Chicago provided general population inmates with free, disposable razors, while also allowing inmates to purchase more expensive razors from the commissary. Because Defendant Conlon sent Mr. Farner back to general population on or around July 14, 2021, Mr. Farner continued to have access to disposable razors that were given to him by MCC Chicago; he would not have been allowed to access those razors if Defendant Conlon had placed him in a suicide watch cell.

39. Later that night, while he was still housed in a general population unit, Mr. Farner attempted suicide by swallowing a bed-frame hook and disposable razor blades that had been provided to him by MCC Chicago.

40. Mr. Farner regretted his suicide attempt after swallowing the razor blades and bed-frame hook, and so he alerted correctional officers. MCC Chicago then sent Mr. Farner to Thorek Memorial Hospital for treatment. For his first few days at Thorek Memorial Hospital, Mr. Farner

9

refused to take pain medication or undergo surgery to remove the razors and bed-frame hook, but he eventually agreed to take medication to alleviate his pain.

41. Mr. Farner was supervised at the hospital by deputy marshals who worked as contractors for MCC Chicago. BOP policy prohibited Mr. Farner from being allowed to use a regular, tie-up gown on account of his recent suicide attempt; instead, Mr. Farner was supposed to be given paper scrubs that lacked ties that could otherwise be used for self-harm. Moreover, on information and belief, under BOP and Thorek Memorial Hospital policy at least one person was supposed to monitor Mr. Farner on a 24/7 basis and comply with the hospital's policy by removing anything in his room that was detachable or could otherwise be used for self-harm.

42. Despite those requirements, Mr. Farner was allowed to use his hospital room's bathroom while being unmonitored. As a result of that policy violation, Mr. Farner was able to attempt suicide a second time—swallowing shower hooks that had not been removed from the bathroom while using his tie-up gown to try to hang himself from the shower's metal rod. Thorek Memorial Hospital staff found Mr. Farner and intervened in time to prevent his suicide.

43. After that second suicide attempt, Mr. Farner eventually agreed to accept full medical treatment, including a surgery to remove the bed-frame hook, razors, and shower hooks that Mr. Farner had swallowed. Thorek Memorial Hospital staff wrongfully removed Mr. Farner's appendix during the surgery, while failing to remove all of the items he swallowed in his suicide attempts before releasing Mr. Farner back to MCC Chicago.

**D.** **Mr. Farner Continued To Attempt Suicide And Engage In Damaging Self-Harm Without Receiving Adequate Treatment Or Intervention From MCC Chicago**

44. In or around mid-July 2021, Mr. Farner returned to MCC Chicago from Thorek Memorial Hospital. Mr. Farner was placed in a suicide-watch cell but was denied medically necessary four-point restraints. It is well-established medical practice that four-point restraints

10

constitute necessary mental health care under certain circumstances to protect patients from themselves. *See* James Stuart Booth, MD; *Four-Point Restraint*, MEDSCAPE (Aug. 8, 2023), https://emedicine.medscape.com/article/1941454-overview?_gl=1*y1nina*_gcl_au*OTMyNDY 4MTguMTc1NjM0NDYyMA (last visited Aug. 27, 2025) ("Four-point restraints may be required for patients with psychiatric illnesses or altered mental status who become violent and dangerous" and they "may be necessary for their own protection and the protection of others."). During this time, it should have been clear to MCC Chicago staff that Mr. Farner was a danger to himself, hence his placement under suicide watch, but staff failed to administer necessary medical care to Mr. Farner through their failure to place him in four-point restraints.

45.     On or around the time of his return, Mr. Farner went through a body scanner, which showed that some of the shower hooks he swallowed had not been removed during the surgery and remained inside his body. Medical staff at Thorek had prescribed Mr. Farner pain medication to cope with ongoing pain from his surgery and suicide attempts. MCC Chicago's medical staff—including medical staff supervised by Defendant Mohan—failed to provide Mr. Farner with the prescribed pain medication even after the body scanner showed that multiple shower hooks had not been properly removed from Mr. Farner's body.

46.     Given his ongoing pain, Mr. Farner repeatedly asked medical and psychology staff, including Defendants Dana and Szyhowski, for access to the prescribed pain medication. Despite those requests, Mr. Farner was only given over-the-counter pain medication such as Tylenol, rather than the stronger pain medication that was prescribed by Thorek Memorial Hospital staff.

47.     Moreover, at some point after Mr. Farner's stomach surgery, MCC Chicago medical staff—including staff supervised by Defendant Mohan—began giving him an incorrect dose of anti-depressant medication that he was taking on a roughly daily basis. Mr. Farner was supposed to receive approximately 225 milligrams of the medication at issue, but MCC Chicago

11

staff provided him with approximately 37.5 milligrams instead—*i.e.*, about 17% of what he was prescribed. It took approximately two weeks for the dosing error to get fixed, and the error caused Mr. Farner to suffer withdrawal symptoms such as erratic sleep patterns, nightmares, and worsening depression.

48. On or around the night he returned to MCC Chicago from Thorek Memorial Hospital, Mr. Farner pulled staples out of his stomach and rubbed feces on the open wound that formed as a result, which he would not have been able to do if he had been placed in four-point restraints. MCC Chicago subsequently sent Mr. Farner back to Thorek Memorial Hospital to close the wound.

49. During that visit, an emergency room doctor at Thorek Memorial Hospital recommended to MCC Chicago staff that Mr. Farner be placed in four-point restraints to protect him from further self-harm, including because the doctor thought Mr. Farner was at risk of continuing to attempt suicide. MCC Chicago ignored the Thorek doctor's recommendation and instead placed Mr. Farner back in a suicide-watch cell upon his return to MCC Chicago.

50. Given that Mr. Farner was still on suicide watch, MCC Chicago staff were required to be monitoring Mr. Farner to ensure he did not access small objects but failed to adequately do so. Mr. Farner was able to obtain a key while receiving a stomach X-Ray at MCC Chicago as a result. Shortly after his return to the facility, Mr. Farner swallowed the key while he was in his suicide watch cell. Mr. Farner would not have been able to swallow the key if MCC Chicago staff—including medical staff supervised by Defendant Mohan—had placed Mr. Farner in four-point restraints as the Thorek doctor recommended.[5]

---

[5] Indeed, four-point restraints proved to be an effective suicide-deterrence method during Mr. Farner's incarceration at another BOP facility. After leaving MCC Chicago, Mr. Farner was transferred to a federal prison in Springfield, Missouri, where he attempted suicide. Springfield BOP staff placed Mr. Farner in four-point restraints after that initial suicide attempt, which

51.     After swallowing the key, Mr. Farner was sent back to Thorek Memorial Hospital for treatment, at which point he received an endoscopy.  Medical staff at Thorek succeeded in removing the key from Mr. Farner's body, and he then returned to a suicide-watch cell at MCC Chicago without being placed in four-point restraints.

52.     MCC Chicago medical staff—including medical staff supervised by Defendant Mohan—did not give Mr. Farner the antibiotics and pain medication that had been prescribed by doctors at Thorek Memorial Hospital to treat his surgery wound.  Days after returning from Thorek, Mr. Farner developed a fever and an infection, while experiencing a significant amount of blood in his stool and vomit.

53.     MCC Chicago staff were aware of Mr. Farner's physical distress at the time, as evidenced by a July 24, 2021 psychology services entry written by Defendant Dana, stating [Mr. Farner] appeared in significant physical distress, complaining his abdomen [was] painful" and describing his demeanor as "lethargic."

54.     MCC Chicago staff were further aware of Mr. Farner's distress because suicide watch cells at MCC Chicago are set up so that inmates on suicide watch are constantly being monitored by correctional officers on duty, who are able to observe the suicide watch cells through walls of transparent pixie glass.  Given that set up, correctional officers on duty witnessed Mr. Farner's medical problems.

55.     MCC Chicago nonetheless failed to provide Mr. Farner with immediate medical treatment for his wound or psychiatric treatment for his ongoing suicidal behaviors, contrary to

---

physically restrained Mr. Farner from continuing to attempt suicide in the short run.  The four-point restraints also deterred Mr. Farner from attempting suicide again in the long run during his incarceration at the Springfield facility, including because the experience of being placed in four-point restraints was miserable and not something Mr. Farner wanted to repeat.

findings in its own psychological reports and the medical problems witnessed by correctional officers at the time.

56. Mr. Farner eventually developed a stomach abscess, including due to MCC Chicago's failure to provide Mr. Farner with antibiotics. Defendant Nowakowski was attending to Mr. Farner on a regular basis and was aware of Mr. Farner's stomach abscess. However, Defendant Nowakowski did not provide any care to Mr. Farner for the wound, despite Mr. Farner telling her the abscess was getting more and more painful, and failed to change the wound dressing on a consistent and timely basis. Dr. Mohan was only willing to approve Mr. Farner's transfer to a hospital for treatment after his fever became so severe and there was blood in Mr. Farner's stool that required a transfer on an emergency basis, at which point Dr. Mohan arranged for an ambulance to send Mr. Farner to Rush University Hospital. Mr. Farner also received an injection of Toradol (a painkiller) before being sent to Rush University Hospital, which resulted in an allergic reaction.

57. Medical staff at Rush University Hospital treated Mr. Farner with an approximately nine-day antibiotic regimen, in addition to draining Mr. Farner's stomach abscess. Mr. Farner was hospitalized at Rush University Hospital for the entirety of his antibiotic treatment before being sent back to MCC Chicago.

58. Upon his return to MCC Chicago, Mr. Farner spoke with staff at MCC Chicago, including Defendants Dana and Szyhowski, about his suicide attempts and deteriorating mental state. Neither Defendants nor anyone else at MCC Chicago referred Mr. Farner to a psychiatric specialist for care. Moreover, MCC Chicago continued to place Mr. Farner in a suicide-watch cell without four-point restraints, in direct contravention of medical recommendations.

59. Mr. Farner informed medical staff at MCC Chicago that he was allergic to Toradol, but Defendant Mohan nonetheless authorized medical staff to administer injections of Toradol

multiple times after Mr. Farner's return from Rush University Hospital. Mr. Farner experienced allergic reactions each time that he received Toradol injections.

60. After his meetings with Defendants Dana and Szyhowski in or around late July 2021, Mr. Farner attempted suicide again by climbing onto a sink in his suicide-watch cell and diving head-first to the ground. Mr. Farner would not have been able to attempt suicide in this manner had MCC Chicago staff, including Defendants Mohan, Dana, or Szyhowski, placed him in four-point restraints. The failure to place Mr. Farner in four-point restraints constituted a deliberate indifference to the necessary medical care he clearly should have received given his repeated pattern of suicidal ideation and suicide attempts, which indicated Mr. Farner was a harm to himself.

61. MCC Chicago sent Mr. Farner to Northwestern Memorial Hospital, where he was treated for neck and head injuries. After approximately a few days of treatment, Northwestern Memorial Hospital released Mr. Farner to MCC Chicago. MCC Chicago then placed Mr. Farner back in a suicide-watch cell without four-point restraints. Again, placing Mr. Farner on suicide-watch without further restraints demonstrates a deliberate indifference to his medical care and needs, as there was no clear indication that Mr. Farner was no longer a danger to his own well-being.

62. A few days later, Mr. Farner made another suicide attempt by diving off his sink again in his suicide-watch cell. Similarly to his earlier suicide attempt, Mr. Farner would not have been able to attempt suicide in this manner had MCC Chicago staff, including Defendants Mohan, Dana, or Szyhowski, placed him in four-point restraints after he returned from his initial visit to Northwestern Memorial Hospital. The repeated failure – despite Mr. Farner's well-documented mental health problems and repeated suicidal ideations of medical care – to place Mr. Farner in four point restraints constitutes a failure to provide him with medical care. The AMA Code of

Medical Ethics makes it clear that there are times that a "health condition may result in behavior that puts patients at risk of harming themselves" and as such, "it may be ethically justifiable for physicians to order the use of…physical restraint to protect the patient." AMERICAN MEDICAL ASSOCIATION, CODE OF MEDICAL ETHICS, Opinion 1.2.7, Use of Restraints (2017). "Four-point restraints may be required for patients with psychiatric illnesses or altered mental status who become violent and dangerous" and they "may be necessary for their own protection and the protection of others." *Four-Point Restraint*, MEDSCAPE (last visited Aug. 27, 2025). The Defendants' failure to restrain Farner denied him necessary medical care, and as a result, allowed Farner to cause significant harm to himself despite numerous, clear warnings that he was at risk of doing just that.

63.     MCC Chicago then sent Mr. Farner back to Northwestern Memorial Hospital for treatment, where he stayed for approximately a few days. In an August 17, 2021 note, Defendant Dana stated that ████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████

64.     Upon his next return to MCC Chicago, Defendant Dana asked Mr. Farner if he still planned to commit suicide, and Mr. Farner confirmed he did.

65.     Only after this fifth suicide attempt did MCC Chicago place Mr. Farner in overnight restraints. During this time, Mr. Farner was still not provided with any psychiatric care.

66.     After being held in restraints overnight, Mr. Farner was transferred to Winnebago County Jail for approximately seven days. During that week-long period, Mr. Farner was kept in a padded cell at Winnebago and placed in a "restraint wrap" twice. MCC Chicago did not provide Mr. Farner with any explanation for his transfer to Winnebago County Jail.

16

67. After spending approximately seven days at Winnebago County Jail, Mr. Farner was airlifted to the Medical Center for Federal Prisoners in Springfield, Missouri ("MCFP Springfield"), where he was treated for fifteen months and finally provided with psychiatric care.

68. On or around the time of Mr. Farner's transfer to MCFP Springfield, the U.S. Attorney's Office handling Mr. Farner's federal criminal case requested that Mr. Farner undergo a competency hearing addressing his competency to stand trial. *Farner v. United States*, No. 21-cr-221-1, Dkt. 23 (N.D. Ill. Aug. 5, 2021). The criminal court subsequently found Mr. Farner not competent to stand trial, with the competency order remaining under seal. *See id.*, Dkt. 97 (sealed order issued on Oct. 19, 2023); Dkt. 122 (May 30, 2024 order discussing how Dkt. 97 found "Joshua Farner not competent to plead guilty or proceed to trial under 18 U.S.C. 4241").

69. During his treatment at MCFP Springfield, Mr. Farner had the opportunity to see a psychiatrist and psychiatric nurse practitioner, which helped stabilize his mental health conditions. MCFP Springfield also immediately placed Mr. Farner in four-point restraints after he attempted suicide once at that facility, and the experience of being placed in four-point restraints deterred Mr. Farner from attempting suicide again while incarcerated there.

**E. Mr. Farner Was Unable To Exhaust His Administrative Remedies While Incarcerated At MCC Chicago, But Exhausted Available Administrative Remedies After Being Transferred To The Federal Medical Center In Springfield, Missouri**

70. Mr. Farner was unable to file a grievance or otherwise exhaust his administrative remedies for the claims at issue in this litigation during his incarceration at MCC Chicago. In particular, the constitutional violations occurred while Mr. Farner was placed on suicide watch, and inmates in the suicide-watch unit at MCC Chicago did not have access to pen, paper, or other materials necessary to submit a complaint or grievance at the institutional level. Moreover, suicide-watch inmates were not allowed to leave their suicide-watch cells or use the library at

17

MCC Chicago, and Mr. Farner was not aware of any postings or other informational materials that informed prisoners like himself of available administrative remedies for constitutional violations.

71.     After being transferred to the federal medical center in Springfield, Mr. Farner discussed the constitutional violations that occurred during his time at MCC Chicago with Ed Hargrove, a correctional counselor who served as a general liaison between MCFP Springfield inmates and staff. The conversation occurred in or around September 2021. Correctional Counselor Hargrove told Mr. Farner that he would need to file a "BP-9" form with the North Central Regional Office in Kansas City, Kansas, before pursuing claims against MCC Chicago. Correctional Counselor Hargrove told Mr. Farner that he could not submit a complaint or grievance to MCC Chicago in the first instance because Mr. Farner was no longer incarcerated at that facility.

72.     In or around September or October 2021, Mr. Farner followed that guidance and mailed a BP-9 form to the North Central Regional Office, which contained a materially identical account of the facts giving rise to the allegations against Defendants as set forth in Mr. Farner's initial Complaint (Dkt. 21).

73.     Within approximately a few months of Mr. Farner's submission of the BP-9, Mr. Farner received a response from the North Central Regional Office informing Mr. Farner that he needed to submit his complaint at the institutional level (corresponding to form BP-8) before filing a BP-9 with their Office.

74.     After receiving that response, Mr. Farner attempted to submit his BP-8 form to Correctional Counselor Hargrove, who informed Mr. Farner that he lacked authority to receive or review the complaint or grievance. Mr. Farner then asked a case manager in his unit for advice, and she told Mr. Farner that because MCC Chicago's conduct resulted in injury, he could file a tort claim with the BOP.

18

75. In reliance on the case manager's advice, Mr. Farner proceeded to file a tort claim with the BOP's tort complaint system at some point in or around the summer of 2022. The tort claim that Mr. Farner submitted contained a materially identical account of the facts giving rise to the allegations against Defendants as set forth in Mr. Farner's initial Complaint (Dkt. 21). Mr. Farner was informed that the BOP would respond to his tort claim in or around February 2023, but he never received a response.

76. While Mr. Farner had access to the library during much of his incarceration at MCFP Springfield, he did not see links to manuals, handbooks, or other documents with information about the BOP's grievance procedures in the library or elsewhere at MCFP Springfield. As a result, Mr. Farner relied on the advice provided to him by Correctional Counselor Hargrove and the MCFP Springfield case manager throughout his exhaustion of available administrative remedies.

77. For these reasons, Mr. Farner has exhausted his available administrative remedies against the individual defendants—as required by the Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(a), which provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." To the extent Mr. Farner was required to submit a grievance at the institutional level at MCC Chicago or take any additional administrative action prior to filing suit, such administrative remedies were not available to Mr. Farner during the relevant time period— including because of his placement in a suicide-watch cell at MCC Chicago where he lacked access to the materials that would have been necessary to prepare and submit a grievance, and due to the ongoing and severe mental health problems that he was experiencing during the time period at issue.

78. After Mr. Farner's treatment at MCFP Springfield was complete, he returned to MCC Chicago on or around December 1, 2022 and was transferred to Livingston County Jail in or around March 2023. Because Mr. Farner did not receive a response to his tort claim, he filed the present action in March 2023.

## COUNT I
**(For Damages Against Defendants Conlon, Dana, Szyhowski, Mohan, And Nowakowski)**
**(Bivens Action For Violation of Mr. Farner's Rights Under The Eighth Amendment; Deliberate Indifference To Serious Medical Needs; Failure To Refer To A Psychiatric Specialist)**

79. Mr. Farner re-alleges and incorporates by reference herein all of the allegations contained in the above paragraphs.

80. A person enjoys an implied private right of action to sue a federal official acting contrary to the person's constitutional rights pursuant to *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971).

81. Because Mr. Farner was convicted of state crimes and was serving his state sentences at the time of the conduct alleged, he qualifies as a prisoner, rather than a pre-trial detainee, for purposes of a *Bivens* action under the Eighth Amendment.

82. For purposes of a *Bivens* action, "federal officials" include guards, officers, medical staff, and other agents employed by federal agencies such as the BOP, along with guards, officers, and other agents employed by private corporations that are under contract with federal agencies to provide correctional and detention services.

83. Defendants Conlon, Dana, Szyhowski, Mohan, and Nowakowski were maliciously, intentionally, deliberately, and/or recklessly indifferent to and/or in disregard of Mr. Farner's serious medical needs by ignoring Mr. Farner's repeated requests for psychiatric medical care, including due to Mr. Farner's history of psychiatric problems, placement on "Care Level 3" status at MCC Chicago, and repeated suicide attempts during the summer of 2021.

84. Mr. Farner benefited from receiving psychiatric care at other BOP facilities, including when his forced medication regimen was enforced at IDOC facilities prior to his arrival at MCC Chicago, while he was incarcerated at MCFP Springfield in or around 2021 through 2022, and during his incarceration at the Federal Medical Center in Devens, Massachusetts during 2024.

85. Defendants' conduct constituted deliberate indifference to a substantial risk of serious medical harm to Mr. Farner.

86. This indifference to and/or disregard of Mr. Farner's medical needs violated Mr. Farner's Eighth Amendment rights under the U.S. Constitution.

87. As a direct and proximate result of Defendants' indifference and/or disregard of Mr. Farner's medical needs, Mr. Farner suffered damages from physical injury due to self-harm, pain, emotional distress, mental anguish, humiliation, and loss of dignity.

## COUNT II
### (For Damages Against Defendant Nowakowski)
### (Bivens Action For Violation Of Mr. Farner's Rights Under the Eighth Amendment; Deliberate Indifference To Serious Medical Needs; Stomach Abscess)

88. Mr. Farner re-alleges and incorporates by reference herein all of the allegations contained in the above paragraphs.

89. A person enjoys an implied private right of action to sue a federal official acting contrary to the person's constitutional rights pursuant to *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971).

90. Because Mr. Farner was convicted of state crimes and was serving his state sentences at the time of the conduct alleged, he qualifies as a prisoner, rather than a pre-trial detainee, for purposes of a *Bivens* action under the Eighth Amendment.

91. For purposes of a *Bivens* action, "federal officials" include guards, officers, medical staff, and other agents employed by federal agencies such as the BOP, along with guards, officers,

and other agents employed by private corporations that are under contract with federal agencies to provide correctional and detention services.

92.     Defendant Nowakowski was maliciously, intentionally, deliberately, and/or recklessly indifferent to and/or in disregard of Mr. Farner's serious medical needs by failing to provide Mr. Farner with prescribed antibiotics and pain medication after he removed staples from his stomach and rubbed feces on his open wound.

93.     That failure to act resulted in Mr. Farner developing a stomach abscess, which was belatedly treated at Rush University Hospital.

94.     Defendants' conduct constituted deliberate indifference to a substantial risk of serious medical harm to Mr. Farner.

95.     This indifference to and/or disregard of Mr. Farner's medical needs violated Mr. Farner's Eighth Amendment rights under the U.S. Constitution.

96.     As a direct and proximate result of Defendants' indifference and/or disregard of Mr. Farner's medical needs, Mr. Farner suffered damages from physical injury due to the stomach abscess and self-harm, pain, emotional distress, mental anguish, humiliation, and loss of dignity.

## COUNT III
**(For Damages Against Defendants Conlon, Dana, Szyhowski, And Mohan)**
**(Bivens Action For Violation of Mr. Farner's Rights Under the Eighth Amendment; Deliberate Indifference To Serious Medical Needs; Failure To Intervene In Ongoing Suicide Attempts)**

97.     Mr. Farner re-alleges and incorporates by reference herein all of the allegations contained in the above paragraphs.

98.     A person enjoys an implied private right of action to sue a federal official acting contrary to the person's constitutional rights pursuant to *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971).

22

99. Because Mr. Farner was convicted of state crimes and was serving his state sentences at the time of the conduct alleged, he qualifies as a prisoner, rather than a pre-trial detainee, for purposes of a *Bivens* action under the Eighth Amendment.

100. For purposes of a *Bivens* action, "federal officials" include guards, officers, medical staff, and other agents employed by federal agencies such as the BOP, along with guards, officers, and other agents employed by private corporations that are under contract with federal agencies to provide correctional and detention services.

101. Defendant Conlon was maliciously, intentionally, deliberately, and/or recklessly indifferent to and/or in disregard of Mr. Farner's serious medical needs. Defendant Conlon knew that Mr. Farner had been placed in a cell by himself in or around July 2021, despite the MCC Chicago policy that inmates (especially those with a history of suicide ideation and mental health diagnoses) not be housed alone. Despite learning of Mr. Farner's plan to commit suicide, Defendant Conlon allowed Mr. Farner to return to a single cell without a cellmate and failed to place Mr. Farner on suicide watch or otherwise intervene to prevent his suicide plan. As a result of that failure to intervene, Mr. Farner was able to carry out his plan in or around July 2021, which resulted in his swallowing razor blades and a bed-frame hook that he was only able to access because Defendant Conlon failed to place Mr. Farner on suicide watch.

102. Defendants Dana, Szyhowski, and Mohan were maliciously, intentionally, deliberately, and/or recklessly indifferent to and/or in disregard of Mr. Farner's serious medical needs by failing to place Mr. Farner in restraints after his first four suicide attempts, despite a medical doctor at Thorek Memorial Hospital advising MCC Chicago that Mr. Farner posed an ongoing danger to himself and should be placed in four-point restraints as a result and that it is well-established that four-point restraints may be medically necessary to protect a patient from self-harm. Those Defendants' failure to place Mr. Farner in four-point restraints enabled him to

continue attempting suicide after his initial attempt—including by swallowing a key and diving headfirst off of a sink on two different occasions in a suicide-watch cell.

103. Defendants' conduct constituted deliberate indifference to a substantial risk of serious medical harm to Mr. Farner.

104. This indifference to and/or disregard of Mr. Farner's medical needs violated Mr. Farner's Eighth Amendment rights under the U.S. Constitution.

105. As a direct and proximate result of Defendants' indifference and/or disregard of Mr. Farner's medical needs, Mr. Farner suffered damages from physical injury, pain, emotional distress, mental anguish, humiliation, and loss of dignity.

## JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Mr. Farner hereby demands a trial by jury in this action of all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Mr. Farner respectfully requests that this Court enter judgment in his favor and against the Defendants and award compensatory and punitive damages and attorneys' fees and costs against Defendants. Mr. Farner also seeks other relief that this Court deems just and appropriate.

Dated: August 28, 2025

Respectfully submitted,

/s/*Mary Rose Alexander*
Mary Rose Alexander, One of the Attorneys for
Plaintiff Joshua S. Farner

Mary Rose Alexander (Bar No. 6205313)
  mary.rose.alexander@lw.com
Johanna Spellman (Bar No. 6293851)
  johanna.spellman@lw.com
Kathryn A. Running (Bar No. 6330369)
  kathryn.running@lw.com

24

LATHAM & WATKINS LLP
330 North Wabash Avenue, Suite 2800
Chicago, Illinois 60611
Telephone: (312) 876-7700
Facsimile: (312) 993-9767

## CERTIFICATE OF SERVICE

I, Mary Rose Alexander, hereby certify that on August 28, 2025, I caused a copy of the foregoing to be filed using the Court's electronic filing system and sent via email to all counsel of record.

Dated:  August 28, 2025

/s/*Mary Rose Alexander*
Mary Rose Alexander, One of the Attorneys for Plaintiff Joshua S. Farner

Mary Rose Alexander (Bar No. 6205313)
LATHAM & WATKINS LLP
330 North Wabash Avenue, Suite 2800
Chicago, Illinois 60611
Telephone: (312) 876-7700
Facsimile: (312) 993-9767
Email:  mary.rose.alexander@lw.com